***********
The Full Commission has reviewed the Deputy Commissioner's Opinion and Award based on the record of the proceedings before the Deputy Commissioner. The appealing party has shown good grounds to reconsider the evidence, and having reviewed the competent evidence of record, the Full Commission hereby reverses the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the deputy commissioner hearing and in a Pre-Trial Agreement as
 STIPULATIONS
1. The parties are bound by and subject to the North Carolina Workers' Compensation Act.
2. At all relevant times, an employment relationship existed between plaintiff and defendant-employer.
3. During the periods plaintiff worked for defendant-employer,
defendant-employer maintained workers' compensation coverage through the following:
Aetna Life Casualty October 1, 1985 until October 1, 1988;
Massachusetts Bay October 1, 1988 until October 1, 1991;
USFG (the Hartford) October 1, 1991 until October 1, 1992;
Harleysville Insurance Co. October 1, 1992 until October 1, 1994;
Royal Insurance Company October 1, 1994 until October 1, 1997;
 Kemper Insurance Company October 1, 1997 until October 1, 1999; and
The Travelers Insurance Co. October 1, 1999 until February 25, 2000.
4. Plaintiff's average weekly wage in 1996, the year plaintiff was diagnosed with asbestosis, was $617.24 yielding a compensation rate of $411.50.
5. Plaintiff's answers to interrogatories from Massachusetts Bay Insurance were stipulated into evidence as Stipulated Exhibit 3.
6. Plaintiff's answers to interrogatories from Royal Sunalliance Insurance were stipulated into evidence as Stipulated Exhibit 4.
7. The issues before the deputy commissioner were: (i) did the plaintiff contract the occupational disease, asbestosis; (ii) if so, did plaintiff's last injurious exposure to the hazards of asbestos occur during his employment with the defendant, Insulating Services, Inc.; (iii) did his last exposure occur during the coverage period of Aetna Life Casualty, Massachusetts Bay, USFG (The Hartford), Harleysville Insurance, Royal Insurance, Kemper Insurance or The Travelers; (iv) what, if any, compensation is the plaintiff entitled to; (v) whether the compensation due plaintiff should be increased by ten (10%) percent due to the injury caused by the willful failure of the employer to comply with any statutory requirements pursuant to N.C.G.S. § 97-12; (vi) if the claim is determined to be compensable, what is the applicable average weekly wage for calculation of any benefits payable; and (vii) whether N.C.G.S. § 97-60, et seq. violates the Constitution of North Carolina to the extent the same imposes liability on employers who are not engaged in dusty trades?
 ***********
Based upon all the competent evidence adduced at the deputy commissioner hearing, the subsequent depositions taken in this action, and the medical records admitted into evidence, the Full Commission makes the following additional
 FINDINGS OF FACT
1. At the time of the deputy commissioner hearing, plaintiff was sixty-four years old. He completed schooling through the 8th grade and later received a GED in the military. Other than his 20 years in the Army, plaintiff spent most of his working life in the insulation industry.
2. Plaintiff started in the insulation business in 1952 when he worked with his father. He continued insulating until 1959 when he went into the military. The majority of the insulation work that he performed between 1952 and 1959 involved insulation containing asbestos. After plaintiff left the military in 1980, he worked for a variety of different insulation companies.
3. Plaintiff began his employment with defendant-employer in 1983 and continued in its employ until February 14, 2000, when he retired. Plaintiff spent the majority of his time working for defendant-employer at a facility in Charlotte that is now owned by B. F. Goodrich. The plant was formerly owned by Freedom Textiles and American Cyanimid during plaintiff's assignments with defendant-employer. For purposes of this opinion, the facility shall be referred to as the "Goodrich plant" irrespective of the particular owner of the plant at the time in question.
4. Defendant-employer is in the insulation business. Defendant-employer is not licensed to handle asbestos, does not perform asbestos abatement, and does not install asbestos insulation. When work needed to be performed in areas believed to contain asbestos, the Goodrich plant called a contractor licensed to perform the necessary asbestos abatement.
5. Plaintiff's work with defendant-employer included installation of insulation for repair work as well as new construction at the Goodrich plant and other locations.
6. Plaintiff has an extensive history of exposure to asbestos. From 1952 to 1959, plaintiff worked in the shipyards and was directly exposed to asbestos. His father and sisters have (or had) asbestosis. His sisters contacted the disease through secondary exposure caused by inhalation of asbestos dust that was brought home on the clothes of plaintiff and his father when they worked in the shipyards. Plaintiff continued to be exposed to asbestos while serving in the Army. Plaintiff was a dining facility manager in the Army and was exposed to asbestos used in cooking ovens, particularly when the ovens were taken apart, from top to bottom, for inspections. Plaintiff was in the Army from 1959 to 1980.
7. Asbestos is located in the Goodrich plant. B.F. Goodrich and its predecessors have performed asbestos surveys and have produced maps, survey reports, and signs that indicate areas where asbestos is known or believed to exist. A Report of Survey to Identify Asbestos-Containing Materials dated December 14, 1998 [hereinafter referred to as "the Survey"], was admitted into evidence [Plaintiff's Exhibit 2], which indicates the presence of asbestos in various tank insulations, floor tile and mastic, pipe insulation, tank wrap black mastic, and roof flashing and membrane. The 1998 survey also includes sampling reports from 1991 and 1995 asbestos surveys at the Goodrich plant. The Survey does not specifically indicate that people at the Goodrich plant were, in fact, exposed to the hazards of asbestos. Further, asbestos was not identified in all parts of the plant. For example, some tanks were indicated to have some asbestos insulation, and other similar tanks did not. In particular, in the Glyoxal area where plaintiff contends that he did much of his work, asbestos was noted in the brown floor tile, but no asbestos was detected in the restroom gray floor tile, the gas preheater tank insulation, and the cooling water treatment unit. Although the Survey establishes that asbestos was present in the Goodrich plant, the Survey itself, does not establish that plaintiff was exposed to the hazards of asbestos and, more particularly, does not establish when, if ever, plaintiff was exposed to the hazards of asbestos for as much as 30 working days within seven consecutive calendar months.
8. Plaintiff testified that he started smoking cigarettes at age 12 and stopped in April 1999. Plaintiff smoked 1-1/2 packs per day for approximately 50 years, for a 75 pack-year smoking history. Plaintiff described his employment in the insulation business in the 1950s when asbestos was widely used and his continued exposure to asbestos in the military in the 1960s when he would routinely take apart ovens insulated with asbestos. Plaintiff was discharged from the military in 1980 and returned to the insulation business where he worked for several different companies in many different locations until he joined defendant-employer in 1983. Plaintiff continuously worked for defendant-employer from 1983 until his retirement in 2000.
9. Plaintiff described his job at the Goodrich plant. As with other contractor employees, Goodrich required employees to attend orientation meetings where Goodrich plant procedures were explained. Plaintiff attended these meetings at the Goodrich plant, and at other facilities where he was assigned to work as an employee of defendant-employer. Plaintiff described working in different areas of the Goodrich plant at different times over the 17 years that he worked for defendant-employer. He started in the Glyoxal department, later in 1986 assisted in putting a new reactor in the Goodrich plant, and he also worked on tanks, vats, and pipes. Plaintiff described that most of the insulation is covered with a metal jacket. In many jobs, plaintiff would remove the old metal jacket surrounding the tank or pipe, and then remove the insulation that rested under the metal jacket. Once the old insulation was removed, the area was squared off, new insulation would be placed to join and abut the old insulation, and a metal jacket would be placed over the insulation to seal it from the weather and other elements. The old insulation would generally fall to the ground and plaintiff would sweep the old insulation up, place it in trash bags, and carry it to a dumpster. Plaintiff explained a typical assignment:
 "[I would] [g]et a work order from the maintenance shop, the maintenance foreman . . . would tell me this is what I need done out here at, for example, the tank farm. And I'd get my little slip, and I'd go down to the Glyoxal plant. And one of the foremans [sic] on duty he would check it out and let us go to work after he signed that. He had to put his — he checked everything that was hazardous at the time down there and what to wear, safety shoes, hardhat, goggles. And they would mark [the slip], and you'd go to work after he signed his name to it."
 [Tr. pp. 82-83]. Plaintiff explained that some times he insulated new construction, but many times he did repairs and patches on old installation.
10. Plaintiff described several instances when he believes that he may have been exposed to asbestos while working for defendant-employer at the Goodrich plant. First, plaintiff described an incident in late 1995, when he had to get dressed in a white suit, gloves, and a mask to take ten samples to determine whether insulation contained asbestos. Plaintiff performed this activity on one occasion; this project took about an hour and a half. Plaintiff never saw the results of the testing on the samples and does not know whether they contained asbestos. Second, plaintiff described having worked, at unidentified times, in locations at the Goodrich plant and later returned to those areas to find signs that said, "This material contains asbestos fibers" or "could contain asbestos fibers," and the signs were not there when plaintiff previously worked on or near that area. Third, plaintiff described in 1996 working in an area of the Goodrich plant when he was told to stop because it was possible that asbestos insulation was in that area of the tank farm. Fourth, plaintiff described that in 1997, he worked on a hot oil heater in the resin plant that was being repaired for leaks, and then in 1999 an asbestos abatement team worked on the same area where plaintiff performed the 1997 repair. Fifth, plaintiff described a time in 1999 when he was told to stop his work because it was possible that asbestos was in the boiler room where he was working.
11. In response to the pivotal question of when he believed that he may have been exposed to asbestos for as much as 30 days in a seven month period, plaintiff testified that he could identify only a period in 1996 when he was working at the Goodrich plant repairing the tank farm and pipe work. Plaintiff testified that he worked in that area for a month and a half or two months and that asbestos abatement crews were later called in 1999 to work in those areas. Plaintiff believed that he was exposed to asbestos when he worked on the tanks because the asbestos abatement crews, with their plastic tents, were called to work there later. On further clarification of this potential exposure, plaintiff explained that he worked on approximately 40 tanks in the tank farm for "almost a month and a half" and that he later saw the asbestos abatement tents on two of the tanks. Plaintiff initially described the work as "repairing" the tanks and pipe work, but he later described that he made periodic small holes, approximately six inches in diameter, in the metal jacket of the tanks, and removed some insulation, so that sonar equipment could be placed to test the integrity of the tanks. During this project plaintiff worked four days a week.
12. Plaintiff also identified several other plants where he worked for defendant-employer and where he believed that he may have been exposed to asbestos, including PPG plant in Shelby, CT Refinery in Charlotte, Abitivity in Wilkesboro, Harold's Foods in Charlotte, Charlotte Airport, R.J Reynolds in Winston-Salem, Duke Power in Charlotte, National Starch in Salisbury, V.A. Hospital in Salisbury, General Marble in Hornell, New York, Hoechst Celanese plant in Mt. Holly, Dan River Mills in Danville, Virginia, J.P. Stevens plant in Columbia, South Carolina, General Tire plant, Campbell Soup plant in Maxton, Earth Grains in Charlotte, Ciba-Geigy plant, R M Industries in Fort Mill, South Carolina, and a power plant in South Carolina. Although plaintiff suspected that he might have been exposed to asbestos at these locations, he did not describe the basis for his belief, except that some of the locations were old, and he did not provide any testimony concerning the nature of his suspected exposure. Plaintiff's testimony regarding these exposures is proof of plaintiff's belief in his potential exposure but is not proof that he was actually exposed at any of these jobs. There was no medical or expert testimony to support plaintiff's belief. Plaintiff did not explain the duration of these jobs and did not provide testimony concerning 30 days of exposure over a seven consecutive month period for these positions, or any combination of work assignments.
13. Plaintiff's testimony concerning exposure has to be weighed with the conceded fact that he is not an expert in asbestos and that he is not able to identify asbestos insulation from some other forms of non-asbestos insulation. Plaintiff concedes that he does not know when or whether he was exposed to asbestos while working for defendant-employer, although it is his belief that he was exposed to asbestos while working for defendant-employer. Plaintiff explained that he could identify fiberglass insulation, mineral wool, spun glass, and foam insulation, but that he was not able to identify insulation containing asbestos. Plaintiff said that he would not know whether insulation contained asbestos or calcium silicate unless it was labeled or tested by a laboratory. Plaintiff stated that, if he saw an area labeled as potentially containing asbestos, he would "steer clear" of the area and not work there. This testimony was supported by Mr. Nichols, who worked for another contractor at the Goodrich plant, and who worked alongside plaintiff. Mr. Nichols explained an occasion when plaintiff appropriately refused to work on a line when plaintiff saw that the line was labeled as containing asbestos.
14. On direct examination, plaintiff testified that he retired from defendant-employer in February 2000 because of his health from asbestos exposure. On cross-examination, plaintiff testified that no doctor advised him to stop working and that he retired because he felt like it was time to retire. Plaintiff was 64 years old when he retired.
15. Although plaintiff asserted that he was regularly, if not continuously, exposed to asbestos while working for defendant-employer, his testimony is not competent evidence in this regard and is not credible. His testimony is inconsistent with his behavior and reports to his doctors. First, plaintiff did not take precautions against potential secondary exposure to his family. Plaintiff dressed for work at home and did not change his clothes or clean up before he went home from work. Plaintiff was aware that asbestos was hazardous and that secondary exposure could cause injury to family members, as his sisters had contracted their disease through secondary exposure. Plaintiff also testified that he would take proper safety measures to avoid any suspected asbestos exposure, and this was confirmed by Mr. Nichols' testimony, referenced above. Yet plaintiff wore his work clothes home, which seems to belie plaintiff's opinion testimony that he was routinely exposed to asbestos dust at work. Second, plaintiff's explanation of constant exposure to asbestos while employed by defendant-employer is not consistent with his discussions with his doctors. Plaintiff told his doctors in detail about exposure to asbestos in employment prior to that with defendant-employer; in contrast, plaintiff did not give specific instances of asbestos exposure with defendant-employer to any physician who examined him in connection with potential asbestos-related disease, including the doctor to whom he was referred by his counsel in this action. Moreover, plaintiff, although aware of the potential hazards of asbestos, concedes that he is not an expert at the identification of asbestos and whether he sustained a hazardous exposure. Therefore, the Commission finds that plaintiff's testimony is entitled to little weight on the issues of exposure and causation, and that his testimony does not dispense with his burden to present some competent evidence on these issues.
16. Howard Vaughn, plaintiff's son, also testified in this action. Howard Vaughn testified that he worked for defendant-employer as his father's helper at the Goodrich plant at various times from 1984 to 1996. Howard Vaughn confirmed plaintiff's description of insulation repair and patchwork and the exposure to unknown dusts during these procedures. Howard Vaughn denied any safety training for work with or around asbestos. Howard Vaughn has not had an x-ray, physical exam, or other medical testing for potential exposure to asbestos and has not sought legal representation for a potential asbestos exposure claim. Howard Vaughn has no personal knowledge of exposure to asbestos while working for defendant-employer and has not been concerned about the risk of potential exposure.
17. Larry Stone, plaintiff's former son-in-law, also testified at the deputy commissioner hearing. Mr. Stone testified that he worked as plaintiff's mechanic helper for about a year in 1986 and then quit because he could not get along with plaintiff. He then worked at the Goodrich plant again in 1996 for a few months. Mr. Stone described repair work consistent with the description given by plaintiff and explained that they were cleaning up the tanks in 1996 when the plant was made to look "pretty so that they could sell the place." Mr. Stone was not aware of any asbestos exposure and would not know asbestos if he saw it.
18. John Frank Ashwell, Jr., plaintiff's first cousin by marriage, testified at the deputy commissioner hearing that he worked for defendant-employer from 1984 to 1986. Mr. Ashwell confirmed plaintiff's description of insulation work for defendant-employer but disagreed as to the description of the insulation in the salt tank area. Mr. Ashwell testified that the insulation in that area was crystallized from the (salt) water getting into the insulation such that insulation that weighed a pound when new would weigh twenty-five to fifty pounds. Mr. McKissick explained that the added weight was from the crystallization of the salt that would leak into the insulation, and that it would have been impossible to tell whether the insulation contained asbestos.
19. Charles Edward McKissick, president and majority stockholder of Insulation Services, Inc. [defendant-employer] described the history of defendant-employer's work at the Goodrich plant. Initially, the work was job specific. An example was when pipes in the salt line would leak, defendant-employer would replace insulation on the salt lines after they were repaired. Around 1990, the Goodrich plant began requesting maintenance work. Mr. McKissick explained that defendant-employer was not in the asbestos business and that its employees were not to touch or disturb any asbestos. Mr. McKissick testified that one could not tell whether insulation contained asbestos unless it was tested. He explained that calcium silicate insulation used before the early 1970s may have contained asbestos and was so marked on the packages and that in the early 1970s the calcium silicate insulation was marked as "asbestos-free." Thus, one could not tell from looking at calcium silicate insulation whether or not it contained asbestos. The calcium silicate insulation had the same appearance whether or not it contained asbestos.
20. Mr. McKissick acknowledged that defendant-employer was required to provide a safe place for its employees to work and to provide necessary safety training. He explained that his company did not do asbestos work and that their employees were instructed to stay away from asbestos. Plaintiff was a foreman with defendant-employer and was hired based on his knowledge of the insulation business. Plaintiff was responsible for supervising new, unskilled employees and for seeing that they complied with necessary safety measures. Mr. McKissick testified that his foremen knew that they were not to work where they suspected that asbestos was present and that they were to turn down work until a proper abatement was performed on suspected areas. It was the responsibility of the foreman, in this case the plaintiff, for the safety of the crew. Mr. McKissick further testified that he was not aware that plaintiff was asked to dress up in a "white suit" and take samples before he performed this task and indicated that plaintiff should have called defendant-employer about this request because it was not within their work duties. Mr. McKissick, however, was aware of the testing on the samples taken and indicated that only one of the samples tested positive for asbestos.
21. With reference to actions taken to protect their employees at the Goodrich plant, Mr. McKissick said that they looked at the history of the plant, that most of it was built after the manufacture of asbestos insulation had stopped, and that they relied on Mr. Deese, the maintenance supervisor, to advise whether asbestos insulation was present in the area to be worked. Mr. McKissick also recalled seeing signs as early as 1993 in the tank farm at the Goodrich plant indicating where asbestos containing materials were located and that it was company policy not to work with asbestos containing materials. Defendant-employer has never been cited by OSHA for a violation concerning exposure to asbestos. Mr. McKissick could not recall an occasion when defendant-employer has been reprimanded or disciplined for improperly handling asbestos insulation. The Industrial Commission has never declared defendant-employer to be a dusty trade.
22. Mr. McKissick explained that most of defendant-employer's work was new construction. In addition, most patch and repair work on older construction occurred when there was a leak. In this instance, the pipefitter repairing the leak would generally remove the old insulation and defendant-employer would then place the new insulation after the pipe was repaired. Thus, the old insulation was generally removed by the pipefitter who did the repair work before the insulation crew would be called to place new insulation on the portion of the pipe that was repaired.
23. Mr. McKissick testified that he was aware of a 1991 asbestos survey where plaintiff took some samples and that when he found out that asbestos was contained in some of the mastic on the pipe elbows, he advised plaintiff not to remove any of that mastic.
24. Finally, Mr. McKissick testified that when plaintiff retired in February 2000, he did not provide a medical note or other documentation indicating that plaintiff was required to stop working. Further, there was no problems with plaintiff's work performance and that the client was happy with his performance.
25. Ray Emser, the safety director for defendant-employer, testified at the deputy commissioner's hearing. Mr. Emser had been employed with defendant-employer for 19 years and had been the safety director for two and a half years. He previously was a job foreman. Mr. Emser met plaintiff in 1983 when plaintiff started to work for defendant-employer. The project manager for the job at Union 76 Chemicals asked Mr. Emser to get to know plaintiff and evaluate his knowledge because plaintiff had been hired as a person with a lot of experience. Plaintiff worked directly with Mr. Emser for several days during which time they discussed plaintiff's background, including his knowledge of asbestos. From this experience, Mr. Emser concluded that plaintiff understood the hazards associated with asbestos.
26. Consistent with other witnesses, Mr. Emser testified that neither he nor any other worker could determine whether insulation contained asbestos by looking at it.
27. Yens Schoenfuss is the health and safety and environmental manger for the Goodrich plant. Mr. Schoenfuss testified at the deputy commissioner hearing and was subsequently deposed by the parties. Mr. Schoenfuss identified the Survey [Plaintiff's Exhibit 2] as a means to identify the location of asbestos containing products at the Goodrich plant. Mr. Schoenfuss was familiar with plaintiff and was aware that he insulated a new oxidizer unit in the plant in 1999 and that he had worked various jobs at the plant. Mr. Schoenfuss testified that Goodrich knew where asbestos was located and that he initiated a program to further mark its location in the plant. In addition, Mr. Schoenfuss stated that, if Goodrich identified a modification, expansion of the plant, or a repair where asbestos was located, an asbestos removal contractor would be called to remove the asbestos. Mr. Schoenfuss coordinated the employment of the licensed asbestos abatement contractors.
28. Mr. Schoenfuss also explained some of the details concerning the Survey. He explained that friable materials are materials that can be crumbled and could allow a potential exposure to asbestos if the materials were crushed. Non-friable material is something that cannot easily be crushed and does not pose an exposure risk. Mr. Schoenfuss gave the example of asbestos found in floor tiles. With the tiles being in good condition there would not be a risk of exposure to the asbestos contained therein. Mr. Schoenfuss explained that, although there was asbestos at the Goodrich plant, a person walking in the plant would not be exposed to asbestos because the materials containing the asbestos are not friable. The asbestos at the plant was in good condition and did not require abatement to comply with government standards. Further, when abatement was necessary because of maintenance in an area containing asbestos, the licensed abatement crews enclosed the area in plastic to prevent potential exposures to other people at the plant.
29. Mr. Schoenfuss explained that the Goodrich plant's policy was that only licensed asbestos contractors were allowed to work on asbestos and that no work was to be done until the material was removed by an accredited contractor. Mr. Schoenfuss, consistent with the testimony from plaintiff, explained that work performed by a contractor, and its employees, was generated by a work order which limits the area in which they are to work in. The work order stated specifically the task that the worker was to perform and the area of the plant where they were to work. The Goodrich plant performed contractor training and advised the contractor employees that there was no reason for them to go to any area of the plant other than the assigned area. Further, the instruction was that, if someone found some suspicious material, such as material believed to contain asbestos, they were not to disturb it but were to contact Goodrich, and Goodrich would direct the work from that point.
30. With reference to Glyoxal plant, Mr. Schoenfuss testified that neither Mr. Vaughn nor anyone else advised him that there was asbestos material located in that part of the plant, nor was there any asbestos abatement work performed in the glyoxal plant in 1999 or 2000. Some abatement work was done in the tank farm in 1999 or 2000.
31. The Goodrich plant has not received an OSHA violation for existence of asbestos in the air.
32. Henry Nichols, a witness who was not able to attend the deputy commissioner hearing was deposed in this action. Mr. Nichols is an employee with Industrial Piping who performed pipe work along with defendant-employer's employees at the Goodrich plant. Mr. Nichols worked alongside plaintiff at the Goodrich plant. Mr. Nichols explained that the policy for outside contractors at the Goodrich plant was that they were not to work with asbestos containing materials and not to work in areas where asbestos was tagged. Mr. Nichols explained that as a pipefitter he often had to remove insulation in order to get access to a pipe for repair and that the insulator would often follow him to insulate the new or repaired pipe.
33. As previously indicated, Mr. Nichols explained an incident between 1996 or 1998 when plaintiff refused to work in an area containing asbestos. Mr. Nichols had asked plaintiff to remove some insulation so that he could cut a line out. Plaintiff climbed up to the line, saw a tag indicating that it may contain asbestos, and appropriately refused to touch it. Plaintiff's behavior was consistent with the policy of the Goodrich plant. Mr. Nichols testified that, when they went through safety training, all of the outside contractor employees were given instructions by the Goodrich plant to not work with asbestos materials. Although Mr. Nichols was not positive that he heard these instructions given specifically to plaintiff, he testified that all contractor employees received this instruction and he believed that plaintiff was aware of the policy.
34. Mr. Nichols has seen plaintiff remove some insulation so that sonar testing could be performed on some tanks. Mr. Nichols testified that those tanks had calcium silicate, fiberglass, or foam glass insulation; there was no indication that these tanks contained asbestos.
35. Douglas George Kelling, Jr., M.D., is a physician specializing in internal medicine and lung diseases. He is board certified in internal medicine and pulmonary medicine. Dr. Kelling first saw plaintiff on April 12, 1996. Plaintiff gave a history of having worked for various companies as an insulator from 1954 to 1982 where he was exposed to asbestos without the benefit of protection from a mask or respirator. Plaintiff did not provide a history of exposure to asbestos after 1982. Dr. Kelling testified that the latency period for damage to the lungs and tissue surrounding the lungs is about twenty years after the initial exposure to the asbestos; the damage to the lungs does not manifest itself immediately. Subsequent exposures to asbestos, including exposures after 1982 could also be injurious. Plaintiff gave a smoking history of a pack a day for 50 years.
36. The physical examination of plaintiff by Dr. Kelling revealed crackles, which is indicative of pulmonary fibrosis. Pulmonary function studies were performed which showed a diminished ratio between FEV1 to FEV at 50 percent of predicted which was consistent with obstructive lung disease and is an expected result in cases of emphysema or damage to the lungs from cigarette smoking. Another significant finding was plaintiff's diffusing capacity, which could be caused by emphysema and pulmonary fibrosis among other lung conditions. Plaintiff was rated, in 1996, with a Class 3 impairment under the AMA guides.
37. Dr. Kelling explained the difference between obstructive lung disease and restrictive lung disease. Obstructive lung disease refers to the ability of a person to expel air from the lungs. In a normal person, it is expected that he would be able to expel at least seventy percent (70%) of the air within the first second of starting to exhale; most individuals can exhale eighty to eighty-five percent. In plaintiff's case, he was only able to exhale fifty percent (50%) of the air within the first second that was indicative of obstructive lung disease. In contrast, restrictive lung disease refers to damage to the lung tissue, for example from scar tissue. Restrictive lung disease can be evidenced by a diminished capacity of the lung to take in air, and secondly a difficulty with diffusion of gases in the lungs. In plaintiff's case he did not have evidence of restrictive disease; his total lung capacity was 5.83, which was one hundred six percent (106%) of his predicted value. The main cause of obstructive lung disease is cigarette smoking. Restrictive lung disease could be caused by scarring from asbestos exposure.
38. X-rays and CT Scans reviewed by Dr. Kelling indicated that plaintiff had changes to his pleura and parenchyma which were consistent with exposure to asbestos and asbestosis. The pleural plaques confirmed that plaintiff had exposure to asbestos and that it was extensive enough to cause damage to the pleura, which is the tissue surrounding the lung. The parenchymal changes were suggestive of interstitial fibrosis which would be consistent with pulmonary fibrosis due to asbestos exposure. From his examination, x-rays, and pulmonary tests, Dr. Kelling concluded in 1996 that plaintiff had asbestosis.
39. In the course of his deposition, Dr. Kelling was presented with pulmonary function studies performed in November 1999. Dr. Kelling expressed that there was a progressive fall in plaintiff's FEV1/FVC ratio which would be consistent with progression of plaintiff's obstructive lung disease, or emphysema. There was no significant change in the total lung capacity. Plaintiff's diffusing capacity was only forty-four percent (44%) of predicted value. Dr. Kelling indicated that plaintiff has a decrease in diffusing capacity which could be associated with asbestos exposure, but he found no other area where asbestos exposure made a significant contribution to plaintiff's disease. Based on plaintiff's 1999 pulmonary function test, Dr. Kelling believed that plaintiff would not be able to work unless it was extremely sedentary employment.
40. Dr. Kelling explained that in taking plaintiff's work history, he was not merely concerned with potential exposure to asbestos, but also was searching for any exposures that could irritate his lungs. The written questionnaire provided to plaintiff asked:
 "Please list any exposure at work to cotton dust, asbestos, sand, other chemicals, dust, fumes, or gasses which you feel have irritated or injured your lungs."
Dr. Kelling explained that plaintiff stopped his history of exposure with his 1982 employment. Plaintiff did not report any exposure while employed by defendant-employer. It would appear that plaintiff did not believe that he had exposure to any pulmonary irritant, including asbestos, while working for defendant-employer.
41. When Dr. Kelling saw plaintiff in 1996, he did not advise plaintiff to leave his employment. Dr. Kelling explained that, if he had been advised that plaintiff's work might expose him to asbestos, he would have made two recommendations: (1) move to an area where he would no longer be exposed to asbestos, or (2) be afforded proper respiratory protection so that he would not have to inhale asbestos. Dr. Kelling explained that the existence of non-friable asbestos is not significant because asbestos which cannot be inhaled would not be injurious to plaintiff.
42. In 1996, Dr. Kelling recommended bronchodilator therapy for plaintiff's chronic obstructive pulmonary disease (COPD) and advised that he be monitored for lung cancer with the belief that the risk of lung cancer could present the most significant threat to plaintiff's continued survival unless his fibrosis begins to worsen.
43. Patrick T. Kelly, M.D., a physician board certified in internal medicine, pulmonary medicine, and critical care was also presented for deposition in this case. Dr. Kelly saw plaintiff for the first time on November 19, 1999, at the referral of plaintiff's attorneys. Plaintiff provided Dr. Kelly with a 50-year history of smoking one and a half packs of cigarettes per day. Plaintiff indicated that his mother had cancer and that his father had asbestosis and that his first exposure was secondary to asbestos brought home on his parents' clothing. Dr. Kelly explained asbestosis is an inherited disease; the patient must be exposed to asbestos to obtain the disease. Physical examination revealed crackles that would be evidence of pulmonary fibrosis or scarring related to asbestos exposure. Examination also revealed signs of "air trapping," which is a feature of cigarette smoking or COPD. Pulmonary function studies showed severe air flow obstruction and moderately reduced diffusion capacity at forty-four percent (44%) of predicted values. Dr. Kelly explained that the obstructive defect was due to cigarette smoking. Diffusion capacity measures the gas exchange from the alveoli into the pulmonary capillaries. The reduction in these values can be caused by emphysema and COPD and by pulmonary fibrosis. In plaintiff's case, he has COPD and emphysema. Dr. Kelly believed that the reduction in diffusion was due to a combination of asbestosis and underlying COPD. Pulmonary function testing did not reveal any restriction. Plaintiff has a Class 4, severe impairment, based on his pulmonary studies.
44. Dr. Kelly opined that plaintiff has asbestosis based on plaintiff's exposure to asbestos, crackles in his lungs, abnormalities on the pulmonary function studies, and x-ray findings, including calcified plaques. Dr. Kelly testified that plaintiff has emphysema that is attributed to cigarette smoking. He did not know whether asbestos exposure contributed to or aggravated the emphysema.
45. Dr. Kelly explained that that baseline latency period for asbestos related pulmonary disease is somewhere between 15 to 20 years, which is the period from the initial exposure to the time that the patient develops manifestation of the disease.
46. Dr. Kelly stated that plaintiff claimed to be exposed to asbestos when he worked for defendant-employer from 1983 to his examination in 1999, but that plaintiff was not clear about the exposure. Plaintiff was not able to delineate his exposure or provide the doctor with any specifics concerning the exposure. Dr. Kelly stated that plaintiff was vague as to his alleged exposure while working for defendant-employer and, despite the doctor's efforts to elicit details of the potential exposure, plaintiff did not provide any specifics. In particular, plaintiff did not tell Dr. Kelly of his potential exposure when working in the tank farm. Plaintiff further did not describe removing asbestos while employed with defendant-employer. Plaintiff's vague, or nonexistent, description of potential exposure to asbestos while employed with defendant-employer is in contrast to his ability to describe his exposure during the 1950s while working in the shipyards and his parents' spread of secondary exposure through their clothes. Plaintiff's inability to provide any exposure incidents to Dr. Kelly is in contrast to plaintiff's hearing testimony. Plaintiff did tell Dr. Kelly about working for an asbestos removal company in Florida in 1980 and 1981. Plaintiff's description of his work in the asbestos abatement industry demonstrates that plaintiff has greater knowledge of asbestos removal than plaintiff related to the Commission.
47. Based on his examination of plaintiff, Dr. Kelly felt that plaintiff should not continue to work in a dusty environment. Dr. Kelly, however, did not believe that it was necessary to advise plaintiff to leave his employment with defendant-employer and did not advise plaintiff to leave his employment, or work in another area.
48. Consistent with the description given by Dr. Kelling, Dr. Kelly explained the difference between obstruction and restrictive pulmonary disease. Dr. Kelly described obstructive disease as the problems with getting air out of the lungs and restrictive disease is problems with getting air into the lungs and getting the lungs to expand. Obstructive disease is generally associated with COPD and smoking. Exposure to asbestos generally does not cause obstructive disease. Asbestos can lead to restrictive disease. Dr. Kelly explained that plaintiff has emphysema and severe COPD. Dr. Kelly also explained that by history plaintiff was exposed to sufficient asbestos prior to his employment with defendant-employer to have caused his asbestosis and that any further exposure could have worsened this condition.
49. Medical records from Dr. Darcy with the Division of Occupational Environmental Medicine at Duke University Medical Center, with an examination date of November 18, 1997, provide an extensive history of plaintiff's exposure to asbestos in the shipyards in the 1950s. Notable is the history that plaintiff worked for an asbestos abatement company in South Florida where he worked on an asbestos abatement project using wet removal techniques, wore a respirator, and was monitored. Again, no specific history of asbestos exposure while employed with defendant-employer was provided by plaintiff. Dr. Darcy noted that plaintiff's exposure during this time period was "less certain." Plaintiff presented with a medical history of emphysema and was assessed for having asbestos related pleural plaques with pulmonary function studies interpreted to show mixed obstructive and restrictive disease with normal lung capacity and diminished diffusion.
50. Dr. Segarra's impression, upon his examination of plaintiff on August 31, 1996, was plaintiff had "pulmonary asbestosis" and "extensive asbestos-related pleural disease" as well as emphysema and severe chronic obstructive pulmonary disease.
51. On June 13, 1997, plaintiff had another chest x-ray, which was read by Dr. James C. Johnson. Dr. Johnson noted small opacities in the mid and lower lung zones bilaterally with a profusion rating of 2/1. He further noted extensive diaphragmatic plaque, circumscribed plaque and pleural calcification, bilaterally.
52. Plaintiff also had another chest x-ray and CT scan performed on November 22, 1999. Dr. Frederick M. Dula noted "emphysematous changes throughout the lung. There were also interstitial changes consisting of short, thickened interlobular septal lines extending to the pleural surfaces predominantly toward the lung bases, and curvilinear septal lines bilaterally. There was extensive calcified plaque formation on the chest wall and diaphragms bilaterally." Dr. Dula's impression was that the findings were "consistent with asbestosis superimposed on emphysema."
53. Plaintiff saw Dr. Peter L. Loper on April 16, 1999. Dr. Loper diagnosed plaintiff with both asbestosis and emphysema as a separate process. He indicated plaintiff's chest x-ray showed bilateral pleural plaques and significant interstitial changes. The reading on the B-reader's scale was 2/1 profusion.
54. There is no evidence in the record to establish plaintiff was exposed to the hazards of asbestos subsequent to his employment with defendant-employer.
55. Based on the greater weight of the credible evidence, plaintiff has pulmonary fibrosis, pleural plaques, and asbestosis which are associated with his exposure to asbestos from 1952 to 1981. Further, the greater weight of the credible evidence is that plaintiff has emphysema and COPD which are caused by his 75 pack-year history of cigarette smoking. Pulmonary function studies reveal significant obstructive disease and mild to nonexistent restrictive disease. Further, the only documented treatment plan in evidence for plaintiff showed that the treatment was for his obstructive disease. Plaintiff is being monitored for suspected restrictive disease, primarily pulmonary fibrosis, and for the risk of cancer.
56. The greater weight of the credible evidence is that plaintiff had sufficient exposure to asbestos to cause his asbestos related disease, including asbestosis, prior to his employment with defendant-employer. No health care provider, or other competent witness, has indicated that plaintiff was exposed to sufficient asbestos while in the employ of defendant-employer to cause the disease from that exposure.
57. Plaintiff has not presented competent lay or expert evidence of exposure and causation during his employment with defendant-employer. Plaintiff contends that he was exposed to the hazards of asbestos and that the last injurious exposure to asbestos was during his employment with defendant-employer. Plaintiff, however, has not established a primafacie case of exposure to the hazards of asbestos for as much as 30 working days, or parts thereof, within seven consecutive calendar months. Plaintiff did not offer medical or expert testimony that plaintiff was exposed to the hazards of asbestos while employed with defendant-employer, and no medical or expert witness testified that plaintiff was hazardously exposed to asbestos for 30 working days within a seven month period while working for defendant-employer. The only testimony on this issue came from plaintiff when he described working at the tank farm at the Goodrich plant in 1996. Plaintiff testified that he worked in that area for a month and a half or two months, and that asbestos abatement crews were later called in 1999 to work in those areas. Plaintiff believed that he was exposed to asbestos when he worked on the tanks because the asbestos abatement crews, with their plastic tents, were called to work there later. On further clarification of this potential exposure, plaintiff explained that he worked nearly 40 tanks in the tank farm for "almost a month and a half" and that he later saw the asbestos abatement tents on two of the tanks. During this time period plaintiff was working four days per week, and thus a month and a half would have consisted of 24 to 28 days. Two months at four days a week would amount to about 32 days. Even assuming that plaintiff's testimony is true, and that two of the tanks had asbestos as indicated by subsequent work by an abatement crew, at the average rate of completing one to two tanks per day, plaintiff's testimony does not establish 30 days of exposure within a seven consecutive month period. Furthermore, exposure to asbestos during employment with defendant-employer cannot be assumed from plaintiff's diagnosis of asbestosis, because plaintiff's exposure to asbestos before his employment with defendant-employer was sufficient to cause the disease. The greater weight of the credible evidence is that plaintiff was not exposed to the hazards of asbestos for 30 or more working days during a seven consecutive month period while working for defendant-employer.
58. Plaintiff has also failed to present any medical evidence that he is disabled, and not able to earn his pre-injury wage because of his asbestos-related disease. First, none of the medical doctors or medical records shows that plaintiff was advised to cease work because of asbestosis-related disease. Second, most of plaintiff's pulmonary function limitation is due to his obstructive disease, which is due to smoking rather than asbestos exposure. Plaintiff's lung capacity studies have been within normal limits, which evidences an absence of lack of restrictive disease associated with asbestos exposure. In contrast, plaintiff's obstructive disease, COPD and emphysema from smoking, is quite severe. Third, plaintiff chose to retire at age 64, and his decision was not made at the request of his doctors. Fourth, plaintiff's employer and the Goodrich plant were satisfied with his work performance and there was no indication that his health precluded his ability to complete his work in a satisfactory manner. Although there is evidence that plaintiff retired, at least in part, due to his health, the greater weight of the medical evidence does not reveal that plaintiff was not capable of continuing his employment or earning his pre-injury wage because of asbestos-related disease.
59. The greater weight of the credible evidence fails to establish a willful failure of defendant-employer to comply with any statutory requirement or any lawful order of the Commission. The record is devoid of reference to a statutory provision or Commission order violated by defendant-employer. There is no showing in this case that defendant-employer has been cited for an OSHA or other safety infraction relevant to this case, let alone that there has been a finding or admission of the violation of an OSHA or other safety provision. The greater weight of the credible evidence is that defendant-employer does not have sole control over the premises where plaintiff has been employed; rather the work performed by defendant-employer's employees is coordinated with the owner or operator of the premises. The relevant evidence in this case is that work performed at the Goodrich plant was determined and directed by Goodrich employees in order to comply with pertinent safety regulations including potential exposure to asbestos. Plaintiff and other witnesses testified to attending safety orientation meetings to learn the Goodrich plant policy and procedures. Further, Goodrich personnel provided the work order, checked their maps and other information to determine whether hazardous material was present, and when asbestos containing or suspected material was involved, the policy was that only licensed abatement contractors could perform work while the asbestos was present. This is evidence of a coordinated plan in accordance with OSHA safety policy, not a willful violation of a safety regulation.
60. Plaintiff is currently retired. There is no evidence that plaintiff has received an order from the Industrial Commission to the effect that he be removed from an occupation that exposes him to asbestos, and the greater weight of the evidence is that plaintiff is not currently, nor has he been at any relevant time during this proceeding, exposed to asbestos. Thus there is no basis for an order removing him from his employment. There is no evidence that defendant-employer is a dusty trade or has been determined to be a dusty trade.
 ***********
The foregoing findings of fact and conclusions of law engender the following
 CONCLUSIONS OF LAW
1. The Industrial Commission is the sole judge of the credibility of the witnesses and the weight to be given their testimony. G.S. § 97-86;Young v. Hickory Business Furniture, 353 N.C. 227, 538 S.E.2d 912
(2000); Adams v. AVX Corp., 349 N.C. 676, 680, 509 S.E.2d 411, 413
(1998). Where the exact nature and probable genesis of a particular type of injury involves complicated medical questions removed from the ordinary experience of laymen, only an expert witness can give a competent opinion as to the nature of and the cause of the injury. Youngv. Hickory Business Furniture, supra; Click v. Pilot Freight Carriers,Inc., 300 N.C. 164, 167, 265 S.E.2d 389, 391 (1980). Expert opinion that rests on speculation and conjecture, or on facts that have been disproved, is not sufficiently reliable to qualify as competent evidence concerning the nature and cause of an injury or disease. Young v. HickoryBusiness Furniture, supra; Dean v. Carolina Coach Co., 287 N.C. 515. 522. 215 S.E.2d 89, 94 (1975); See also Daubert v. Merrell DowPharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786 (1993). Speculation, or mere possibility, does not satisfy plaintiff's burden to present at least a prima facie case of a compensable claim. See Swink v. ConeMills, 65 N.C. App. 297, 309 S.W.2d 271 (1983).
2. Plaintiff has not established that he has sustained the occupational disease of asbestosis while in the course and scope of his employment with defendant-employer. G.S §§ 97-53; 97-57. Although plaintiff has presented competent evidence of asbestosis, he has not established that that he had sufficient exposure to asbestos during his employment with defendant-employer to cause his disease. Section 97-53 provides that in an occupational disease the employee must establish that he was "exposed to such chemicals in such form and quantity, and used with such frequency as to cause the occupational disease mentioned in connection with the chemical." Plaintiff has not presented competent expert testimony that plaintiff was exposed to sufficient quantity of asbestos during his employment with defendant-employer to have caused his asbestosis and asbestos-related lung disease. To the contrary, the evidence is that plaintiff's exposure to asbestos prior to his employment with defendant-employer was sufficient to have caused his disease. Rather than pursuing a claim for asbestosis pursuant to Section 97-53, plaintiff has sought to establish that defendant-employer is liable as the last employment where plaintiff was injuriously exposed to the hazards of the disease. See G.S. § 97-57. Section 97-57 of the Act provides that the employer where plaintiff was "last injuriously exposed to the hazards of the disease" is the liable employer and that the carrier on the risk when plaintiff was last injuriously exposed is liable for the workers' compensation claim for the cumulative occupational disease. The phrase "last injurious exposure" is clarified in the second paragraph of Section97-57 to require that plaintiff establish exposure "for as much as 30 working days, or parts thereof, within seven consecutive calendar months." G.S. § 97-57. Any exposure less than this period is not "injurious." Id. Section 97-57 speaks of hazardous exposure to asbestos, which, for purposes of an alleged pulmonary lung disease, requires inhalation or other exposure to asbestos in a manner that it may cause or contribute to cause, accelerate, aggravate, or exacerbate the disease. Asbestos which is non-friable, encapsulated, or in other form such that it would not cause or contribute to asbestosis or other pulmonary disease is not, while in that form, a "hazardous" exposure. Under the facts of this case, plaintiff has not established through competent evidence hazardous exposure to asbestos for thirty working days, or parts thereof, within a seven consecutive calendar month period.
4. Plaintiff has not established disability because of a compensable occupational disease. G.S. §§ 97-29; 97-30.
5. Plaintiff is not entitled to 104 weeks of compensation pursuant to Section 97-61.5 because plaintiff has not received an order of the Commission compelling him to leave employment where he is exposed to asbestos and plaintiff is not in a position where he is exposed to asbestos. See Austin v. Continental General Tire, ___ N.C. ___,553 S.E.2d 680 (2001) (per curium), reversing the decision of the Courtof Appeals in accordance with a dissent by Greene, J., 141 N.C. App. 397,540 S.E.2d 284 (2000). Having determined that plaintiff is not entitled to benefits under Section 97-61.5, the Commission does not have to address whether this provision applies to employers who have not been certified as a dusty trade.
6. Section 97-12 requires plaintiff to establish a willful violation of a statutory requirement or a lawful order of the Commission in order to receive a 10% penalty. The record is devoid of the reference to a statutory provision or Commission order willfully violated by defendant-employer. Therefore, the deputy commissioner erred in rendering a statutory penalty of 10 percent. G.S. § 97-12.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following
 AWARD
1. Plaintiff's claim for asbestosis and asbestos-related pulmonary disease while in the course and employment of defendant-employer or while last injuriously exposed in the employment of defendant-employer, is DENIED.
2. All costs shall be taxed against the party that incurred same.
 S/_______________ RENEE C. RIGGSBEE COMMISSIONER
CONCURRING:
 S/_______________ DIANNE C. SELLERS COMMISSIONER
DISSENTING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER